1 | ALEX G. TSE (CABN 152348)
Acting United States Attorney

2

3 | BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

4 | PHILIP J. KEARNEY (CABN 114978)
MATTHEW L. McCARTHY (CABN 217871)

5 | Assistant United States Attorneys

6 | 450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

7 | Telephone: (415) 436-6838
Fax: (415) 436-6982

8 | Matthew.McCarthy@usdoj.gov

FILED

MAR 21 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



9

10

11 | UNITED STATES DISTRICT COURT

12 | NORTHERN DISTRICT OF CALIFORNIA

13 | SAN FRANCISCO DIVISION

14

15 | UNITED STATES OF AMERICA,

      Plaintiff,

16

17 |     v.

18 | JUSTIN E. HUBBARD,

      Defendant.

19

20

21

) CASE NO. CR 17-00278 JD
)
)
)
) **UNITED STATES' SUPPLEMENTAL**
) **SENTENCING MEMORANDUM RE; LACK OF**
) **SENTENCING DISPARITY AND**
) **RISK OF HARM**
)
)
)
) Hon. James Donato
)
) [UNDER SEAL]
)

22

23

24

25

26

27

28 | U.S. SUPPLEMENTAL SENTENCING MEMORANDUM
CR 17-00278 JD

ORIGINAL

1  ALEX G. TSE (CABN 152348)
   Acting United States Attorney
2
   BARBARA J. VALLIERE (DCBN 439353)
3  Chief, Criminal Division

4  PHILIP J. KEARNEY (CABN 114978)
   MATTHEW L. McCARTHY (CABN 217871)
5  Assistant United States Attorneys

6       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
7       Telephone: (415) 436-6838
        Fax: (415) 436-6982
8       Matthew.McCarthy@usdoj.gov

9

10

11                 UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14

15  UNITED STATES OF AMERICA,              )   CASE NO. CR 17-00278 JD
                                           )
16       Plaintiff,                        )
                                           )   **UNITED STATES' SUPPLEMENTAL**
17       v.                                )   **SENTENCING MEMORANDUM RE; LACK OF**
                                           )   **SENTENCING DISPARITY AND**
18  JUSTIN E. HUBBARD,                     )   **RISK OF HARM**
                                           )
19       Defendant.                        )
                                           )
20                                         )   Hon. James Donato
                                           )
21  _____)   [UNDER SEAL]

22

23

24

25

26

27

28  U.S. SUPPLEMENTAL SENTENCING MEMORANDUM
    CR 17-00278 JD

**INTRODUCTION**

At the March 7, 2018, initial sentencing hearing on this matter, the parties discussed several issues relating to the appropriate sentence of defendant Justin Hubbard.  At the conclusion of that hearing, the Court directed the parties to file supplemental briefing addressing: (1) the potential for unwarranted sentencing disparity between defendant Hubbard and previously-sentenced defendant Stephen Rolfe, and (2) issues of potential or actual harm caused by the defendant Hubbard's conduct.

As discussed below, the government does not believe that there is a significant risk of an unwarranted sentencing disparity since defendants Hubbard and Rolfe are not similarly situated.  Moreover, Hubbard's criminal misconduct caused both actual and potential harm, which should be reflected in his sentence.

**FACTUAL BACKGROUND**

Stephen Rolfe, the defendant in related case CR 17-0123 JD, pleaded guilty pursuant to written agreement to a violation of 18 U.S.C. § 1519 – Destruction, Alteration, or Falsification of Records in Federal Investigations in connection with the falsifying of records relating to the remediation of radioactive waste at the Hunters Point Naval Shipyard ("HPNS") in San Francisco, California.  Rolfe's plea included an agreement that Rolfe would cooperate with the United States government.  At his sentencing, the government moved, pursuant to United States Sentencing Guidelines section 5K1.1, for a two-level downward departure and a sentence of 8 months.  The Court granted the government's motion and sentenced Rolfe to 8 months imprisonment.

Justin Hubbard, the defendant here, likewise pleaded guilty to a violation of 18 U.S.C. § 1519.  Hubbard's conduct was similar to Rolfe's in that it related to the falsification of records relating to the remediation of radioactive waste at HPNS.  However, Hubbard's plea did not include an agreement that Hubbard would cooperate with the government—in large part because Hubbard insisted that he had no information about criminal conduct of other persons.

The parties appeared for sentencing on March 7, 2018.  The government initially sought a sentence of 21 months, but after the Court ruled that a two-point enhancement under U.S.S.G. § 3B1.3

1  did not apply, now seeks a sentence at the high-end of the applicable guidelines range, 18 months.  The

2  defendant is seeking a term of home confinement.

3          After a lengthy discussion, the Court directed the parties to file supplemental briefs addressing

4  the potential unwarranted sentencing disparity between defendants Hubbard and Rolfe.  The Court

5  further indicated that the parties could address the issues of potential harm caused by defendant

6  Hubbard's conduct.

7                                          **ARGUMENT**

8  **A.    There Is No Risk of an Unwarranted Sentencing Disparity Here Because Rolfe Received a
        Sentence Reduction Under U.S.S.G. § 5K1.1, and Hubbard Is Not Entitled to Such a**
9  **      Reduction**

10         Title 18 § 3553 provides the statutory framework for sentencing.  Section 3553(a)(6) directs the

11  Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar

12  records who have been found guilty of similar conduct."  It is essential to note that § 3553(a)(6) warns

13  against *unwarranted* sentencing disparities.  (Emphasis added).  Where, as here, one defendant has

14  provided substantial assistance to the government and another has not, the disparity between their

15  sentences is justified, and does not run afoul of § 3553(a)(6).

16         The Ninth Circuit addressed this exact issue in *United States v. Winters*, 278 Fed. Appx. 781,

17  2008 U.S. App. LEXIS 10812 (9th Cir. 2008).  There, co-defendant Totten relied on § 3553(a)(6) in

18  arguing that sentencing reductions given to his co-defendants rendered his sentence unreasonable.  *Id.* at

19  *783.  In rejecting this argument, the Court observed that "the goal of uniformity set forth in

20  § 3553(a)(6) is a goal of national uniformity based on the sentencing guidelines," and is "only one of

21  multiple factors that must be balanced by the district court."  *Id.*  Moreover, the Court noted that

22  "acceptance of responsibly and assistance to the prosecution are other relevant factors."  *Id., citing*

23  U.S.S.G. § 5K1.1.  The court thus concluded that a "sentencing reduction based on an individual's

24  acceptance of responsibility and assistance to the prosecution does not create an 'unwarranted'

25  disparity."  *Id.*

26         The Ninth Circuit reached a similar conclusion in *United States v. Laurienti*, 731 F.3d 967, 976

27  (9th Cir. 2013).  There, defendant Laurienti was sentenced to 36 months imprisonment after trial.  His

28  U.S. SUPPLEMENTAL SENTENCING MEMORANDUM
    CR 17-00278 JD                                    2

1  brother, John, who cooperated with the government, received 16 months sentence. *Id.* Laurienti argued

2  that this rendered his sentence unreasonable, particularly since he alleged that John was the

3  "mastermind" of the scheme at issue. *Id.* at 971, n.3. The Ninth Circuit rejected this argument, finding

4  that "a sentencing disparity based on cooperation is not unreasonable." *Id.* at 976. The *Laurienti* court

5  relied on the Ninth Circuit's earlier ruling in *United States v. Carter*, 560 F.3d 1107, 1121 (9th Cir.

6  2009), in which the court concluded that the disparity between the sentences of Carter and his

7  cooperating co-defendants was not unwarranted because the cooperating co-defendants were not

8  "similarly situated to Carter."

9     Numerous other circuits have similarly found that the difference in sentences imposed between

10  cooperators and non-cooperators are not "unwarranted" disparities. *See, e.g., United States v. Duhon*,

11  541 F.3d 391, 397 (5th Cir. 2008) (finding that district court's "consideration of the *warranted*

12  sentencing disparity between Duhon and his [cooperating] codefendant was improper" as a basis to

13  reduce Duhon's sentence) (emphasis original); *United States v. Cain*, 487 F.3d 1108, 1114-15 (8th Cir.

14  2007) (rejecting sentencing disparity argument and holding that the defendant "is not similarly situated

15  to [co-defendants], both of whom cooperated and testified for the government"); *United States v. Meza*,

16  127 F.3d 545, 550 (7th Cir. 1997) (finding that a disparity between cooperating and non-cooperating

17  defendants was "justified by the Sentencing Commission in its creation of § 5K1.1, which produces

18  disparities by providing for a possible downward departure"); *United States v. Horn*, 946 F.2d 738, 746

19  (10th Cir. 1991) (finding that "substantial assistance reduction afforded codefendants reflects different

20  circumstances and does not confer an independent right on the defendant for an identical reduction").

21     At the sentencing hearing, counsel for Hubbard argued that he could not avail himself of a

22  reduction under § 5K1.1 because Hubbard asserts that he is solely responsible for his actions, and thus

23  has no one against whom he can cooperate. However, this argument does not warrant a reduction in his

24  sentence. The plain language of § 5K1.1 requires that a court may depart downward upon "a motion

25  from the government stating that the defendant has provided substantial assistance in the investigation or

26  prosecution *of another person who has committed an offense*." U.S.S.G. § 5K1.1 (emphasis added).

27  The application notes to that section amplify this requirement:

28  U.S. SUPPLEMENTAL SENTENCING MEMORANDUM
   CR 17-00278 JD                                                    3

1    The sentencing reduction for assistance to authorities shall be considered independently of any
2    reduction for acceptance of responsibility.  Substantial assistance is directed to the investigation
     and prosecution of criminal activities by persons other than the defendant, while acceptance of
3    responsibility is directed to the defendant's affirmative recognition of responsibility for his own
     conduct.

4    U.S.S.G. § 5K1.1, Application Note 2.

5        Here, the court has already determined that Hubbard is entitled to a two-point reduction for his

6    acceptance of responsibility under § 3E1.1(a), and has granted the government's motion for a further

7    one-point reduction for acceptance of responsibility under § 3E1.1(b).  Hubbard's admission of his own

8    guilt and assertion that "the buck stops" with him is not sufficient to warrant any further departure under

9    § 5K1.1.  Because defendant Rolfe earned reductions in his sentence under both § 3E1.1 and § 5K1.1, he

10   and Hubbard are not "similarly situated" for sentencing purposes.

11   **B.    Hubbard's Criminal Misconduct Caused Actual Financial Harm to the U.S. Government,
             and Potential Harm to the Health of Individuals**
12
         The fraud engaged in by the defendant contributed to a massive and multi-layered loss to the
13
     United States Navy. (*See* Declaration of Department of the Navy, Base Realignment and Closure
14
     Director, Laura Duchnak, attached as Exhibit A).  On a strictly financial level, the collective fraud
15
     committed by Tetra Tech employees has led to the loss of hundreds of millions of dollars. *Id.* As stated
16
     by Director.Duchnak:
17
         "In sum, the Navy has expended $272.8 M to date paying Tt EC for their work at HPNS,
18        identifying the fraud, and taking measures to prevent further fraud.  Depending on the cost of
          required re-work, this number will certainly rise to $372.8 M and is likely to rise as high as
19        $572.8 M.  This amount of money would buy a new Littoral Combat ship.  It is nearly half of the
          Navy's total expenditures for *all* environmental clean-up activities at HPNS through fiscal year
20        2017 ($991.1 M).  This is money that could otherwise have been used by the Navy to train
          sailors, build ships, purchase aircraft – in short, to perform the Navy's core mission of fighting
21        the country's wars, deterring aggression, and maintaining the freedom of the seas." *Id.* at 3
          (emphasis in original).
22

23       The defendant's attempts to minimize the harm attributable to his own behavior is unpersuasive.

24   The potential and perceived severity attendant with exposure to radiation by the public has properly

25   mandated a complete reassessment of Tetra Tech's work by the Navy.  Likening his misconduct to the

26   manipulation of candies in a jar is both misleading and callous.  The Navy does not have the option of

27   minimizing the potential threat to human health, it must perform a thorough—and wildly expensive—

28

1   re-analysis by companies with employees that can be trusted to do their jobs.

2      Beyond its substantial financial loss, the fraud has also caused the loss of hundreds if not

3   thousands of hours of manpower by the Navy. *Id.* at 2. As noted by Director Dunchak:

> "In addition to responding to the media, correcting misinformation, and responding to the concerns of the public and politicians, the Navy's Base Realignment and Closure (BRAC) Office created a special Review Team to assess the fraud allegations, determine what level of additional site investigation was needed, perform sampling, and then incorporate these findings into a new Work Plan for HPNS. These activities diverted significant numbers of BRAC employees from their normal duties, causing additional disruption to numerous other Navy projects across the country. This diversion of personnel and resources resulted in delays and increased costs for these other projects and resulted in constant stress on the Navy staff over a sustained period of time. The efforts of the Review Team and other similar efforts (including legal and contract dispute efforts, technical re-calculations, political briefings to the City and Congressional delegations, and constant communication up and down the Navy chain of Command), has cost Navy personnel hundreds if not thousands of hours of additional work." *Id.*

12      Finally, the fraud has caused a basic loss of trust by the public in one of the esteemed pillars of

13   American society, the U.S. military. As again noted by Director Dunchak:

> "The fraud committed by Mr. Hubbard and others has undermined the taxpayer's trust in the Navy as a good financial steward. Taxpayers trust that the Navy only asks for what it needs, knowing that there are many other important and vital uses for limited funds. The Navy invests an enormous amount of time, energy, and pride in building this trust, and because of that, the military is generally considered one of the most trusted institutions in America. But it only takes the misconduct of a few individuals to erode that essential trust - misconduct like Mr. Hubbard's." *Id.* at 3.

19      Beyond the financial, reputational, and resources loss to the Navy—and potentially much more

20   important—is the possible impact on human health associated with the fraud in this case. As noted by

21   EPA Health Physicist David J. Kappleman in his Declaration attached as Exhibit B, HPNS was declared

22   a 'Superfund' Site on the National Priorities List (NPL) in 1989. *See* Exhibit B ¶ 3. The NPL is a list of

23   Superfund Sites given national priority for cleanup based on their threat to human health or the

24   environment. *Id.* Mr. Kappleman noted that HPNS housed the Naval Radiological Decontamination

25   Laboratory from 1948 to 1969. *Id.* In addition, the North Pier at HPNS served as the decontamination

27   site for heavily irradiated naval ships that participated in atomic bomb testing at the Bikini Atoll in 1946.

28   U.S. SUPPLEMENTAL SENTENCING MEMORANDUM
CR 17-00278 JD                          5

1 | *Id.* at ¶¶ 3 and 6.

2 |     The Superfund investigation combined with the Navy's historical assessment of the Site

3 | identified four radionuclide contaminants (among others) at HPNS that posed a threat to human health

4 | and the environment: radium-226, plutonium-239, strontium-90, and cesium-137. *Id.* at ¶ 4. Radium-

5 | 226, plutonium-239, and strontium-90 have each been identified as human carcinogens. *Id.* at ¶ 5(a)-(c).

6 | Exposure to large amounts of cesium-137 can cause cellular damage in humans as well as acute

7 | radiation syndrome including nausea, vomiting, diarrhea, bleeding, coma, and death. *Id.* at ¶ 5(d).

8 |     Despite his protestations to the contrary, the fraud committed by the defendant at the North Pier

9 | did pose a risk to human health. After fraudulently claiming that the approximately 80 samples he

10 | collected from the Pier on May 31, 2012, were clean—thereby in effect declaring the area fit for human

11 | occupation—re-testing specifically proved him wrong. As noted by Health Physicist Kappelman:

> "Re-sampling determined that excessive levels of radiation remained after fraudulently being deemed clean by Tetra Tech employees, including Justin Hubbard. One of the survey units deemed clean by Justin Hubbard, Survey Unit 1, required multiple additional survey sampling and two additional dirt removals before it finally met the release criteria for radium-226, that is 1 pico curie per gram or less." *Id.* at ¶ 7.

16 |     Lastly, a high school graduate with admittedly no special skill in making radiological

17 | assessments should not be allowed to dictate when a previously irradiated site is clear. The defendant's

18 | fraud was harmful on a variety of levels, this Court should sentence him to the upper end of the

19 | applicable guideline.

## CONCLUSION

21 |     For the reasons set forth above, as well as those set forth in the PSR, the government respectfully

22 | requests that the Court sentence the defendant to a term of 18 months of imprisonment, followed by 3

23 | //

24 | //

25 | //

26 | //

27 | //

1  years of supervised release, and impose a fine of $10,000.

2

3  Dated:  March 21, 2018                           ALEX G. TSE
                                                     Acting United States Attorney
4

5                                                   MATTHEW L. McCARTHY
6                                                   PHILIP J. KEARNEY
                                                     Assistant United States Attorneys
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  U.S. SUPPLEMENTAL SENTENCING MEMORANDUM
    CR 17-00278 JD                                          7

# EXHIBIT A



**DEPARTMENT OF THE NAVY**
BASE REALIGNMENT AND CLOSURE
PROGRAM MANAGEMENT OFFICE
33000 NIXIE WAY, BLDG 50 STE 207
SAN DIEGO, CA 92147

5820
Ser BPMO/003
March 15, 2018

The Honorable James Donato
United States District Court
Northern District of California
Federal Building and Courthouse
450 Golden Gate Avenue
San Francisco, California

Dear Judge Donato:

SUBJECT:    VICTIM IMPACT STATEMENT IN THE MATTER OF U. S. V. HUBBARD

The Department of the Navy has been designated a crime victim under 18 U.S.C. § 3771 as a result of the fraud committed by Mr. Hubbard, a former employee of Tetra Tech EC Inc. (Tt EC), and others. The Navy contracted Tt EC to prepare planning documents, investigate radiological contamination, conduct remediation, dispose of radioactive waste, and document their activities to support closure of radiologically-impacted sites and buildings at Hunters Point Naval Shipyard (HPNS) from 2003 to 2014. These activities were necessary prior to the Navy turning HPNS over to the City of San Francisco for redevelopment. The fraud committed by Mr. Hubbard and other Tt EC employees has caused not only a substantial financial loss to the Navy, but harm to the Navy's reputation, and it has cost the Navy substantial resources and time. The purpose of this statement is to give the Court a sense of the magnitude of the negative impact of this fraudulent conduct and how it has made the accomplishment of both the Navy's and the City's goals more difficult. Because of the widespread and continuing harm that he has caused the Navy, we ask that you award Mr. Hubbard a substantial sentence.

While the fraud committed by Mr. Hubbard and others has caused the Navy concrete and measurable monetary loss (addressed below), this fraud has also caused significant harm to the Navy that is much more difficult to quantify - but very real. The fraud and uncertainty surrounding Tt EC's work at HPNS has caused a complete loss of trust in the Navy by the local community. The new residents at HPNS are understandably anxious for their safety, and this has required additional effort by the Navy and regulators to address these concerns. The transfer of the property to the City will be delayed by many years, and the Navy has had to address the ire and frustration of the Mayor's Office, the Supervisor's Office, and local Congressional staffs. The redevelopment of HPNS was supposed to revitalize the community and provide jobs and affordable housing; all of that is now on hold indefinitely as the Navy and the regulatory agencies have determined that Tt EC's work is unreliable. The frustrations of these local constituencies have been channeled into a strong activist element which has made the Navy's public meetings tense, aggressive and explosive.

5820
Ser BPMO/003
March 15, 2018

   The fraud committed by Mr. Hubbard and others has also led to negative national media
attention. The effort to respond to this negative media attention has required increased staffing
to answer questions, prepare for interviews, and conduct risk communication training – all of
which pulled Navy staff away from their primary duties and caused collateral impacts to other
Navy bases and projects.

   In addition to responding to the media, correcting misinformation, and responding to the
concerns of the public and politicians, the Navy's Base Realignment and Closure (BRAC) Office
created a special Review Team to assess the fraud allegations, determine what level of additional
site investigation was needed, perform sampling, and then incorporate these findings into a new
Work Plan for HPNS. These activities diverted significant numbers of BRAC employees from
their normal duties, causing additional disruption to numerous other Navy projects across the
country. This diversion of personnel and resources resulted in delays and increased costs for
these other projects and resulted in constant stress on the Navy staff over a sustained period of
time. The efforts of the Review Team and other similar efforts (including legal and contract
dispute efforts, technical re-calculations, political briefings to the City and Congressional
delegations, and constant communication up and down the Navy chain of Command), has cost
Navy personnel hundreds if not thousands of hours of additional work. The Navy estimates that
the fraud committed by Mr. Hubbard and others has set back the planned transfer of HPNS
property to the City by an approximate decade. This means not only lost development
opportunities for the City and the local community, but continued cost to the Navy to hold and
maintain the property.

   The fraud has also caused a loss of confidence by the regulatory community (both EPA and
California State regulators) regarding the Navy's radiological remediation program and the
Navy's competence to implement it. The EPA has expressed to the Navy that they no longer
have confidence in the work performed by Tt EC at HPNS, as well as at other Navy radiological
sites including those located at Treasure Island and Alameda in the San Francisco Bay Area.
The Navy now faces an uphill struggle to rehabilitate itself from this negative connotation in the
regulatory community. It will take years to rebuild this credibility.

   As I indicated above, the negative fiscal impact to the Navy of the fraud committed by Mr.
Hubbard and others at HPNS is consequential, and continues to be assessed. The Navy awarded
sixteen contract task orders to address radiological work at HPNS to Tt EC. To date, the Navy
has paid Tt EC $261.8M for work performed at HPNS. Due to the uncovered fraud, all of this
work has been called into question and may need to be re-performed. After discovering evidence
of Tt EC data falsification/manipulation, and becoming aware of allegations from former Tt EC
employees/subcontractors, the Navy hired an independent contractor (Battelle) to provide daily
onsite radiological quality assurance for all Navy contractors performing radiological work at
HPNS. This cost approximately $2.2M. The Navy also hired CH2MHill to re-evaluate the work
performed and documented by Tt EC at HPNS. CH2MHill reviewed Tt EC's radiological

5820
Ser BPMO/003
March 15, 2018

database for buildings and soil sites for falsification/manipulation using a variety of statistical and logic tests. This analysis provided evidence of previously-undiscovered data falsification and manipulation, which prompted the Navy to begin preparing work plans for an independent analysis of the worksite. The total cost for the database evaluation, work plan preparation, and preliminary field work is approximately $8.8M. The Navy is currently working with federal and state regulatory agencies to determine the extent of rework that will be necessary at HPNS in order for the Navy to obtain the required "free release" from the regulatory agencies to turn the property over to the City. The EPA has indicated that it would require all work to be re-performed as originally contracted. However, these discussions are not final. The Navy's best estimates for required re-work costs currently range from $100M to $300M.

In sum, the Navy has expended $272.8 M to date paying Tt EC for their work at HPNS, identifying the fraud, and taking measures to prevent further fraud. Depending on the cost of required re-work, this number will certainly rise to $372.8 M and is likely to rise as high as $572.8 M. This amount of money would buy a new Littoral Combat ship. It is nearly half of the Navy's total expenditures for *all* environmental clean-up activities at HPNS through fiscal year 2017 ($991.1 M). This is money that could otherwise have been used by the Navy to train sailors, build ships, purchase aircraft, – in short, to perform the Navy's core mission of fighting the country's wars, deterring aggression, and maintaining the freedom of the seas.

The fraud committed by Mr. Hubbard and others has undermined the taxpayer's trust in the Navy as a good financial steward. Taxpayers trust that the Navy only asks for what it needs, knowing that there are many other important and vital uses for limited funds. The Navy invests an enormous amount of time, energy, and pride in building this trust, and because of that, the military is generally considered one of the most trusted institutions in America. But it only takes the misconduct of a few individuals to erode that essential trust - misconduct like Mr. Hubbard's.

Mr. Hubbard's actions had far-reaching consequences for the United States, its employees, the City of San Francisco, the local residents, and the taxpayers. The Navy therefore respectfully requests that the Court consider a severe sentence for Mr. Hubbard that is commensurate with the adverse impacts of his fraud upon the Navy.

Sincerely,

*Laura Duchnak*

LAURA DUCHNAK
Director

3

# EXHIBIT B

1

2          IN THE UNITED STATES DISTRICT COURT

3        FOR THE NORTHERN DISTRICT OF CALIFORNIA

4                SAN FRANCISCO DIVISION

5

6   UNITED STATES OF AMERICA,

7            Plaintiff,                    Case No. CR 17-278 JD

8   v.                                     DECLARATION OF DAVID J. KAPPELMAN
                                           IN SUPPORT OF GOVERNMENT'S
9   JUSTIN E. HUBBARD,                     SUPPLEMENTAL SENTENCING
                                           MEMORANDUM RE: LACK OF
10           Defendant.                    SENTENCING DISPARITY AND RISK OF
                                           HARM
11

12                                         Date:   March 21, 2018
                                           Time:   10:30am
13

14

15       1.      I make this declaration in support of the Government's Memorandum Regarding

16   Sentencing Disparity.

17       2.      I am a health physicist with the United States Environmental Protection Agency ("EPA").

18   I have been so employed since March 1995. I have a Bachelor of Science degree in Electrical and

19   Electronic Engineering from the California State University of Sacramento. I have worked as a Nuclear

20   Engineer or Health Physicist since March 1992. I have training and experience in radiological detection

21   and quantification. I have performed Gamma Spectroscopy on environmental matrices (soil, water, air,

22   etc.) and on performance evaluation samples while employed by the EPA National Air and Radiation

23   Environmental Laboratory and was the Deputy Team Commander of the Radiological Emergency

24   Response Team responding to radiation emergencies nationwide. I currently work for the EPA

25   Environmental Response Team assisting EPA regions with Superfund radiological emergency response,

26   site investigations, cleanups, and oversight nationwide. I have been assisting EPA Region 9 with

27   reviewing prior documentation and new U.S. Navy work plans to verify that the Navy's radiological

28

1   cleanup meets the release criteria specified in the EPA Record of Decision for Hunters Point Naval

2   Shipyard.

3        3.        Hunters Point Naval Shipyard, (HPNS), is a Superfund site located in southeastern San

4   Francisco, California, and was first listed on the National Priorities List (NPL) in 1989. The NPL is a

5   list of Superfund Sites that are given national priority for cleanup, based upon an assessment of the level

6   of threat posed to human health or the environment from known or threatened releases of hazardous

7   substances or pollutants at the site. The HPNS is currently owned by the U.S. Navy, which is the lead

8   agency responsible for the cleanup. In addition to serving as a repair facility for the U.S. Navy, the

9   HPNS Superfund Site was the location for the Naval Radiological Defense Laboratory (NRDL),

10  operated by the Navy, from 1948 to 1969. The work at NRDL included radiological decontamination of

11  ships exposed to atomic weapons testing as well as research and experiments on radiological

12  decontamination and the effect of radiation on living organisms and materials.

13       4.        The Superfund investigation and cleanup of contamination at HPNS is a multi-phase

14  project that has been on-going for more than 20 years. After a comprehensive historical assessment, the

15  Navy identified 84 areas that either were contaminated or had the potential to be contaminated by

16  radiological materials. The radionuclide contaminants at the Site that pose a threat to human health and

17  the environment include, among others, radium-226, plutonium-239, strontium-90, and cesium-137.

18  The Navy addressed each area through a time critical removal action to immediately identify and

19  remove the radioactive contamination in soil, debris, and buildings base-wide. Tetra Tech, EC Inc.

20  (TtEC) was the contractor hired by the Navy to perform this portion of the cleanup. TtEC provided

21  radiological investigation and remediation services to the Navy at Hunters Point Naval Shipyard from

22  2003 to 2014.

23       5.        The Agency for Toxic Substances and Disease Registry (ATSDR) provides the following

24  information on radium-226, plutonium-239, strontium-90, and cesium 137, the radionuclides of concern:

25       a. Radium-226 is one of the two main isotopes of radium found in the environment. Radium is a

26  radioactive substance formed from the breakdown of uranium and thorium. Radium has been shown to

27  cause effects on the blood (anemia) and eyes (cataracts). It also has been shown to affect the teeth,

28

1   causing an increase in broken teeth and cavities.  Exposure to high levels of radium results in an

2   increased incidence of bone, liver, and breast cancer. The EPA and the National Academy of Sciences,

3   Committee on Biological Effects of Ionizing Radiation, have stated that radium is a known human

4   carcinogen.

5   　　b.  Plutonium is a radioactive material that is produced in nuclear reactors; only trace amounts

6   occur naturally.  The most common plutonium isotope is plutonium-239.  The main health effect from

7   exposure to plutonium is cancer which may occur years after exposure. The types of cancers most likely

8   to develop are cancers of the lung, bones, and liver. The Department of Health and Human Services

9   (DHHS), International Agency for Research on Cancer (IARC), and the EPA's Office of Air and

10  Radiation (OAR) consider plutonium to be a human carcinogen.

11  　　c.  Strontium-90, a radioactive isotope of strontium, is formed in nuclear reactors or during the

12  explosion of nuclear weapons.  Radioactive strontium generates beta particles as it decays. Exposure to

13  stable or radioactive strontium occurs from ingesting contaminated food or drinking water or breathing

14  contaminated air.  High levels of radioactive strontium can cause anemia or cancer.  The International

15  Agency for Research on Cancer (IARC) has determined that radioactive strontium is a human

16  carcinogen.

17  　　d.  Two radioactive forms of cesium, including cesium-137 are produced by nuclear explosions

18  or the breakdown of uranium in fuel elements.  Cesium binds strongly to moist soils and does not travel

19  far below the surface of the soil. One can be exposed to radioactive cesium by eating food that was

20  grown in contaminated soil, or by coming near a source of radioactive cesium.  Exposure to large

21  amounts of radioactive cesium damages cells from the radiation.  Acute radiation syndrome can occur,

22  which includes nausea, vomiting, diarrhea, bleeding, coma, and even death in cases of very high

23  exposures.

24  　　6.　　During the relevant period, Justin Hubbard and Stephen Rolfe were two Tetra Tech

25  Radiological Task Supervisors who oversaw all the field sampling necessary to determine the scope and

26  extent of radiological contamination under the Navy's and Tetra Tech's work plans.  Justin Hubbard was

27  responsible for overseeing sampling at numerous locations, including the North Pier.  Historically, Berth

28

6, 7, 8, and 9 at the North Pier were used for berthing ships associated with radiological activities,

including Operation Crossroads, NRDL experimental and waste disposal barges. Operation Crossroad

ships were contaminated by radioactivity during atomic bomb testing at the Bikini Atoll in 1946.

Hundreds of ships became contaminated, the most heavily impacted of which were sent to HPNS for

decontamination.

7.     Justin Hubbard admitted to falsifying samples taken at the North Pier on May 31, 2012,

from four separate survey units. The total number of samples falsified from these four survey units was

approximately 80. These were samples taken for the final survey, meaning, if the sample dirt passed the

standard for release, the area was deemed "clean" freeing it up for eventual release by the Navy to

civilian authorities. It was only the action of the Navy catching the falsification that caused the areas to

be re-sampled. Re-sampling determined that excessive levels of radiation remained after fraudulently

being deemed clean by Tetra Tech employees, including Justin Hubbard. One of the survey units

deemed clean by Justin Hubbard, Survey Unit 1, required multiple additional survey sampling and two

additional dirt removals before it finally met the release criteria for radium-226, that is 1 pico curie per

gram or less.

8.     Because of the possible adverse health effects from ionizing radiation and the long decay

periods (half-lives) for many radionuclides, removal and off-site disposal is considered the most

effective option for most of the radioactive contaminants found at HPNS. For example, the half-life of

radium-226, the radionuclide left behind by Mr. Hubbard on the North Pier is 1,600 years. Physical

removal of radioactive materials ensures that the potential for diffuse radioactivity is reduced to levels

that meet or are below clean up goals.

DATED: March 21, 2018

DAVID J. KAPPELMAN
Health Physicist
United States Environmental Protection Agency